UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA and                Case No. 14-12170
STATE OF MICHIGAN, ex rel,
SUSAN VICK, MSW,                            Hon. Thomas L. Ludington

      Plaintiff-Relator,

                                        **MATTER FILED
IN CAMERA AND
UNDER SEAL**

-vs-

FIRST STATE HOME HEALTH CARE, INC.,
a Michigan corporation; and SHAHID IMRAN
Jointly and Severally,

      Defendants.
_____/

HERTZ SCHRAM PC
By:   Patricia A. Stamler (P35905)
Attorneys for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302-0183
(248) 335-5000
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff-Relator, Susan Vick, for herself and on behalf of the United States

of America and the State of Michigan, by and through her attorneys, HERTZ

SCHRAM PC, hereby files this Complaint under the False Claims Act ("FCA"),

31 U.S.C. § 3729, *et seq*., as amended by the False Claims Act Amendments of

1986 and The Fraud Enforcement and Recovery Act of 2009,  the Civil Monetary

{H0129127.1}

Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act, MCL 400.601 *et seq.* ("Acts") and states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1345 and 31 U.S.C. §§3730(b) and 3732(a) and (b).

2.      31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act.  In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.  Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) or any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred."  Defendants were doing business

{H0129127.1}                                        2

at all times material to this Complaint, and the claims set forth in this Complaint arose, at least in part, in this judicial district.

## PARTIES

4.     *Qui tam* Relator Susan Vick (hereafter "Relator") is a citizen of the United States and is a resident of the State of Michigan.

5.     Defendant FIRST STATE HOME HEALTH CARE, INC. (hereafter "FIRST STATE HHC") is for all times relevant to this Complaint a Michigan corporation with its principal place of business in Saginaw, Michigan.

6.     Defendant SHAHID IMRAN (hereafter "IMRAN"), is for all times relevant to this Complaint a resident of the State of Michigan and is the owner and CEO of Defendant FIRST STATE HHC.

## LEGAL FRAMEWORK

7.     Under the False Claim Act, this complaint is to be filed in-camera and remain under seal for a period of at least sixty (60) days and under the Medicaid False Claims Act the complaint is to be filed in-camera and remain under seal for a period of at least ninety (90) days and shall not be served on defendants until the Court so orders.  The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and the state government may elect to intervene and proceed

with the action within ninety (90) days after it receives both the Complaint and the

material evidence.

8.     Relator is the original source of the information of the allegations

contained in this Complaint.

9.     The False Claims Act (FCA) provides in relevant part the following:

(a) Any person who (1) knowingly presents, or causes to be
presented, to an officer or employee of the United States
Government or a member of the Armed Forces of the United
States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a
false record or statement to get a false or fraudulent claim
paid or approved by the Government; (3) conspires to
defraud the Government by getting a false or fraudulent
claim paid or approved by the Government;… or (7)
knowingly makes, uses or causes to be made or used, a false
record or statement to conceal, avoid or decrease an
obligation to pay or transmit money  or property to the
Government, is liable to the United States Government for a
civil penalty of not less than $5,500 and not more than
$11,000, plus 3 times the amount of damages with the
Government sustains because of the act of that person….

(b) For purposes of this section, the terms "knowing" and
"knowingly" mean that a person, with respect to
information (1) has actual knowledge of the information; (2)
acts in deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or
falsity of the information, and no proof of specific intent is
required.

31 U.S.C. §3729.

## HOME HEALTH CARE

Medicare

10.     Medicare is a federal program providing health insurance to the aged and disabled.

11.     Medicare Part A provides benefits for "hospital, related post-hospital, home health services, and hospice care" under the administration of the Centers for Medicare & Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS").

12.     Health care providers enter into agreements with HHS to receive direct reimbursement for the reasonable cost of services provided to Medicare beneficiaries.

13.     Medicare Part B, or "Supplementary Medical Benefits Program for the Aged and Disabled," is also administered by CMS.

14.     The task of processing and paying Medicare Part B benefits is delegated to "contract carriers," which are the approximate equivalents of "fiscal intermediaries" in the Medicare Part A payment process.

15.     Qualified home health agencies ("HHAs") are entitled to Medicare reimbursement for the reasonable costs of medical treatment of Medicare beneficiaries.

16.     HHAs are reimbursed for their reasonable costs through fiscal intermediaries, which review claims and make payments on behalf of the Secretary of HHS.

17.     Medicare coverage extends only to reasonable, necessary, and proper costs actually incurred in furnishing Medicare services.

18.     Claims for payment must be filed within one year of the date of service.

19.     An HHA is not permitted to participate in the Medicare program unless it operates and provides services in compliance with all applicable federal, state, and local laws and regulations.

20.     The CMS-1450 form is the claim form for government payment of home health services and requires the provider of home health services to certify that the claim information is true, accurate, and complete upon penalty of prosecution under state or federal laws.

21.     A claim for Medicare payment must also be signed by the provider of services.

22.     In order to qualify for home visits from health care providers under Medicare regulations, physicians must certify the patient's need for home health care, and the patients must meet various Medicare criteria, including being

"homebound" defined as: (A) to require the full assistance of another person and must use a supportive device or have medical contraindications to leaving home and have only infrequent and brief absences from home which must be solely for medical care; and (B) to require intermittent or part-time skilled nursing services or physical, speech or occupational therapy.

23.    Patients receiving home health visits must be re-certified by a physician every 60 days.

24.    The physician who recertifies the patient must verify that the patient is homebound, needs a qualified skilled service, is under the signing physician's care, and the signing physician has reviewed and approved a "Plan for Care" for the patient.

25.    Documentation in the patient's medical record must clearly indicate that the patient experiences considerable and taxing effort to leave home, by way of example, a record indicating a patient is short of breath after ambulating five feet and needs to rest, would suffice.  Documentation stating the patient is "short of breath" or has "poor endurance" does not meet the requisite documentation to support the provision of homebound services.

26.     A patient's record that contains check off of boxes 18a and 18b of the CMS Form-485 without supporting documentation does not satisfy Medicare requirements for homebound services.

27.     CMS Pub.11, § 204.1 provides multiple examples of what constitute homebound status, including:

A.     A paralyzed patient due to a stroke who is confined to a wheelchair or requires the aid crutches to ambulate;

B.     A blind or senile patient who requires the help of another person to leave his or her home;

C.     A patient who is unable to use his or her upper extremities, causing him/her to be unable to open doors, use handrails on steps, etc. and requires the assistance of another individual to leave his/her home;

D.     A patient who just returned from the hospital post surgery who may be suffering from resultant pain and weakness and thus his or her actions may be restricted by his/her doctor for certain and limited activities, like getting out of bed solely for a specific amount of time, walking stairs once a day, etc.;

E.     A patient with arteriosclerotic heart disease of severity that he/she is required to avoid all stress and physical activity;

F.     A patient with mental illness whose illness is manifested, in part, by his/her refusal to leave his/her home or is of a nature that it would not be considered safe for the person to leave his/her home unaccompanied, even if this person has no physical limitations; and

G.     A patient who is in the late stages of ALS or another neurodegenerative disability.

28.     According to CMS guidelines, examples of when a patient would not be considered homebound include:

   A.    Leaves home frequently for non-medical reasons, even though the patient is taxed;

   B.    Drives a vehicle;

   C.    Leaves home several times a week to go out for a meal;

   D.    Leaves home against medical advice; and

   E.    Leaves home for business purposes or to attend school.

29.     Supervision of home health services may be performed by a physician or registered professional nurse.

30.     A claim is payable only if the provider furnishes sufficient information to determine whether payment is due and the amount of payment.

Medicaid

31.     Michigan has provided home health Medicaid benefits since 1992 through a program that is now called the MI Choice Waiver Program, or simply "MI Choice."

32.     MI Choice provides Medicaid coverage for home health care services to eligible elderly or disabled adults based on income.

33.     MI Choice is administered by the Michigan Department of Community Health ("MDCH") Medical Services Administration ("MSA").

34.     MDCH fulfills its Medicaid obligations through a network of providers, referred to as "waiver agents," that operate as organized health care delivery systems ("OHCDS") to provide necessary services.

Home Health Coverage

35.     Home health service coverage generally extends to skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy, medical social services, medical supplies, certain osteoporosis drugs, and intern or resident-in-training medical services.

36.     Providers of home health services are paid through a prospective payment system (PPS) for each 60-day episode of care for each beneficiary.

37.     If a beneficiary still qualifies for home health care after the end of his/her first episode of care, re-certification occurs and a second episode of coverage and care will begin.

38.     There is no limit to the number of re-certifications an eligible beneficiary for the home health benefits can receive but the payment for each episode (re-certification) must be adjusted to reflect the beneficiary's health condition and needs at the time of recertification.

39.     The home health PPS consists of six main components:

a.    **Payment for the 60-day Episode of Care**: The unit of payment under HHA PPS is for a 60-day episode of care, also known as the certification period. An HHA, like Defendant FIRST STATE HHC, receives half of the estimated base payment for the full 60 days immediately after the fiscal intermediary receives the initial claim. This estimate is based upon the patient's condition and care needs (case-mix assignment) determined through the Outcome and Assessment Information Set (OASIS). The HHA will receive the balance of the base payment at end the 60-day episode unless there is an applicable adjustment to the base amount.  Another 60-day re-certification can be initiated for eligible patients.

b.    **Case-mix adjustment**: The patient's physician prescribes a home health plan of care which is provided to the HHA.  The HHA is then supposed to assess the patient's condition and his/her likely skilled nursing care, therapy, medical social services and home health aide service needs. This assessment must be done for each subsequent episode (re-certification) of patient in home health care.  A nurse or therapist from the HHA uses the OASIS tool (a detailed checklist) to assess the patient's condition. OASIS items require the evaluator to describe the patient's condition, his/her expected therapy needs (*e.g.*, occupational, physical and/or speech-language pathology) to determine the case-

mix adjustment to the standard payment rate. This adjustment is known as the "case-mix adjustment." The Home Health Resource Group (HHRG) contains 80 case-mix groups to classify patients based upon clinical severity, functional status, and service utilization.

     c.    **Outlier payments**: Additional payments for the care of the highest cost beneficiaries will be made to the 60-day case-mix adjusted episode payments for those beneficiaries who incur unusually large costs or unusually high levels of services. These *outlier payments* will be made for episodes where imputed costs exceed the threshold figure for each case-mix group. The outlier payment amount will be a proportion of the amount of the imputed costs above the threshold figure. Further, the outlier costs are calculated for each episode through the application of the national per-visit amounts to the number of visits by discipline (skilled nursing visits, PT, OT, Speech and Language, and/or home health aide services) reported on the claims and then decreased by the value of a loss sharing ratio.

     d.    **Adjustments to payments for beneficiary care**:

       i.    Beneficiaries who require only a few visits during the 60-day episode**.**

    The PPS has a low-utilization payment adjustment ("LUPA") for beneficiaries whose episodes consist of four or fewer visits.  These episodes are paid in a standardized, service-specific per-visit amount multiplied by the number

of visits actually provided during the episode. Savings from reduced episode payments are redistributed to all episodes paid under the PPS. An HHA receives a full episode of care payment when a patient dies during the episode of care, but the HHA does not receive such full payment if the episode was subject to a LUPA.

> ii.   <u>Adjustments for beneficiaries who change HHAs</u>.

The home health PPS includes a provision to accommodate a partial episode payment adjustment. When a beneficiary elects to transfer his or her care to a different HHA or when a beneficiary is discharged and readmitted to the same HHA during the 60-day episode, a new episode of care is triggered. The partial episode payment (PEP) allows the first 60-day episode to end and a new episode to begin when a beneficiary transfers to another HHA or is discharged and readmitted to the same HHA within the 60-day period because of a decline in his or her health condition. When the new 60-day episode commences, a new plan of care and a new assessment are required. The initial 60-day episode payment is proportionally adjusted to reflect the length of time the beneficiary remained under the HHA's care prior to the intervening event. The new episode is paid an initial episode payment of one half of the new case mix group, or HHRG, and the 60-day period is restarted.

   e. **Budget neutrality**: The Balanced Budget Act requires base year PPS outlays to be budget neutral relative to the payments under IPS limits less 15 percent.

   f. **Consolidated billing**: Under the PPS an HHA must bill for all home health services (*i.e.*, nursing and therapy services, routine and non-routine medical supplies, home health aide and medical social services, excluding DME).

## GENERAL ALLEGATIONS

First State HHC

  40. Defendant First State HHC provides home health services in the following counties:  Saginaw, Bay, Midland, Tuscola, Genesee, Gladwin, Clare, Gratiot, Huron and Arenac.  Its Saginaw office is located at 3901 Fortune Blvd, Saginaw, Michigan 48603.   It also has offices located in Caro and Standish, Michigan.   Relator serviced patients in Ogemaw County.

  41. According to its website Defendant First State HHC is Medicare certified.  www.firststatehhc.com (last visited on 3-28-14).

  42. Defendant First State HHC employs RNs, LPNs and certified Nursing Assistants, Home Health Aides, Physical Therapists, Occupational Therapists, Speech-Language Therapists, Medical Social Worker and a variety of ancillary

services such as x-ray, lab work, ultrasound, bone density, CT scan, MRI, Mammography, Endoscopy and EEG. www.firststatehhc.com

43.     On or about June, 2012, Relator commenced her employment with Defendant First State HHC as a part-time social worker.

44.     Relator's part-time work hours have varied from week to week depending on the number of home visits she conducted.

45.     Relator's job duties have included interfacing with Defendant First State HHC's nurses or therapists who have informed her that a particular person needed social work assessment and/or social work services.

46.     Upon receipt of her assigned patients, Relator would in turn call the patients to schedule a date and time for her visit.

47.     Approximately 40% to 50% of the times Relator attempted to reach an assigned patient it took several efforts before she was actually able to speak to him/her.

48.     Prior to Relator contacting an assigned patient to schedule a patient visit for treatment or assessment, Relator receives notice of the patient's doctors' appointments and/or hospitalizations on daily or every other day basis.

49.    Many of the patients assigned to Relator's patient list received physician's services from a visiting physician who provides medical care in the patients' homes.

50.    Relator has personal knowledge of the following patients who did not qualify for homebound services:

A.    On or about February 12, 2014, Relator left to voicemails for JF in an effort to schedule a visit.  On or about February 13, 2014, JF's son answered Relator's call and informed Relator that his mother was not at home.  On or about February 18, 2014, Relator placed a fourth call to JF and reached her voicemail.  JF as someone who is supposed to be "homebound" should have been home to answer the phone on one of the several occasions Relator called her.  On almost every time when Relator was not able to reach JF, she contacted her assigned agency nurse to determine whether she had a physician's appointment scheduled on that date and time.  Relator was informed that no such doctor's appointments were scheduled.

B.    On or about February 14, 2014, Relator contacted patient HR who told Relator that she was "not available." On or about February 18, 2014, Relator called and did not reach HR after letting the phone ring ten times. On February 20, 2014, Relator called HR and reached her voicemail. HR, as someone who is supposed to be "homebound," should have been home to answer the phone on one of the several occasions Relator called her.  On each occasion when Relator was not able to reach HR, she contacted her assigned agency nurse to determine whether she had a physician's appointment scheduled on that date and time.  Relator was informed that no such doctor's appointments were scheduled.

C.    On or about February 20, 2014, Relator attempted to contact patient RW and reached her voicemail.  On or about February

24, 2014, Relator contacted RW who told Relator that she was "not going to be home" at the time Relator sought to provide services.  On or about March 7, 2014, Relator called RW.  RW told Relator that she was not going to be home and to call her next week.

D.    Relator made multiple efforts to reach patient RG to schedule services and reached his voicemail on February 17, 25, 27, 2014 and March 11, 14 and 19, 2014.  RG, as someone who is supposed to be "homebound," should have been home to answer the phone on one of the several occasions Relator called him.  On each occasion when Relator was not able to reach RG, she contacted his assigned agency nurse to determine whether he had a physician's appointment scheduled on that date and time.  Relator was informed that no such doctor's appointments were scheduled.

E.    Relator made multiple efforts to reach patient WH to schedule services and reached his voicemail on January 16, 2014, February 20, 27, 2014 and March 5 and 14, 2014. WH, as someone who is supposed to be "homebound" should have been home to answer the phone on one of the several occasions Relator called him.   On each occasion when Relator was not able to reach WH, she contacted his assigned agency nurse to determine whether he had a physician's appointment scheduled on that date and time.   Relator was informed that no such doctor's appointments were scheduled.  On April 29, 2014, Relator visited WH. Prior to the meeting Relator called WH to arrange the visit with him she called his cell phone.  WH told Relator that he would meet her at his home in a ½ hour, stating that he was "out and about."  During Relator's meeting with WH, he exited his residence on two occasions to retrieve items from his van.

F.    Relator made multiple efforts to reach patient MT to schedule services and reached her voicemail on March 21, 25 and 26, 2014.  MT as someone who is supposed to be "homebound" should have been home to answer the phone on one of the

several occasions Relator called her.  On each occasion when Relator was not able to reach MT, she contacted her assigned agency nurse to determine whether she had a physician's appointment scheduled on that date and time.  Relator was informed that no such doctor's appointments were scheduled.

G.    Relator's co-worker, Varil Williams, a social worker, noted in patient AH's record that on March 5, 2014 she did not answer the door for the scheduled visit.  When AH failed to answer her door, Ms. Williams contacted her assigned agency nurse to determine whether AH had a physician's appointment that was scheduled on that date and time.  Ms. Williams was informed that no such doctor's appointment was scheduled.

H.    On or about February 16, 2014, Relator completed services for patient AM.  Upon leaving AM's apartment with him, Relator observed AM walking about two blocks to a local party store.  It was approximately 5:30 p.m., it was dark outside, the sidewalks were icy and the temperature was near zero.

I.    On March 24, 2014, Ms. Williams was assigned to provide services to a patient named TM.  His file had noted that his homebound status as "No." However, on April 9, 2014, Relator observed that the March 24th chart entry was altered by Varil Williams and indicated that TM was homebound due to "residual weakness per RN."  Ms. Williams changed the chart after Relator asked why this patient was receiving homebound services when he did not meet the definition of "homebound."  TM is a retired minister who regularly leaves his apartment with former parishioners.

J.    Relator read a social worker's entry in patient JH's record stating that on February 19, 2014, "He and spouse is (sic) able to walk to the store."  Relator observed that the nearest store is about three blocks away from the patient's residence.  JH's ability to ambulate to and from his residence to a store about three blocks from his home, he is not "homebound."

K.   Relator read a social worker's entry in patient BP's record documenting on February 10, 2014, the following "Client will attend First Ward Community Center on Mon-Thurs 8:30 am-3:30 pm."  BP's ability to attend a community center four days a week for seven hours each day, she is not "homebound."

L.   Relator's patient EB is on house arrest with an electronic tether. EB's records indicate that her most recent certification period is February 19, 2014 to April 19, 2014.  She was previously certified for "homebound" services for the following time periods:  December 23, 2013 to February 18, 2014, June 23, 2013 to August 21, 2013, and April 24, 2013 to Relator understands that EB's "homebound" status is related to her tether and not a medical condition warranting homebound status.  Relator observed that EB was able to attend meetings with her probation officer several times each month without any problems other than getting someone to drive her.

M.   Relator read Varil Williams' social worker's entry in patient JG's record documenting on February 21, 2014, that that the patient will attend First Ward Community Senior Citizens program Monday, Wednesday and Friday. JG's attendance at a senior citizens' program three days a week means he is not "homebound."

N.   Relator's patient WS drives her adult, developmentally disabled son to and from programming through community mental health five days each week.

O.   Relator's former patient MT was driving herself to grandchildren's school and sports activities on at least a weekly basis.

P.   Relator's former patient MM was walking to and from the nearest grocery store, located three to four blocks from her apartment, one to two times weekly.

Q.      Relator's former patients LF and MF are both developmentally disabled, attend regular mental health programming and openly admitted to Relator that they would go out shopping and running errands several times each week.

R.      Relator's former patient CG was walking to any destination (friends' homes, errands, local party store, etc.) on a regular basis.

S.      Relator's patient RK was scheduled for a social work visit for 2:00 PM on Friday, April 4, 2014.  Upon Relator's arrival she was met at the door by one of the patient's daughters.  RK's daughter told Relator that "he went out to lunch with my sister. They should be back in an hour or so."  Relator returned to RK's home later that day at about 4:15. RK's daughter told Relator that he was still not home.

T.      On April 15, 2014, Relator provided services to her assigned patient, MG.  MG accompanied Relator to the apartment building parking lot, located a long distance from his apartment. MG informed Relator that he was going to the store and told Relator that he goes to the store multiple times a week.  He walked without any difficulty and had no shortness of breath. He entered his van and drove away.

U.      On April 21, 2014 Relator visited GJ.  As Relator was leaving GJ's home, he told Relator that he was going to ride his electric wheelchair to "the dollar store to buy picture frames."

51.    During Relator's tenure with FIRST STATE HHC, Paula Martinez, RN; Karin Collins, RN; Ruth Monroe, RN; Jill Cooper, RN, a former employee of FIRST STATE HHC; Brenda Allen, LPN; and Joe Snead, PTA told Relator that their patients were receiving "monitoring" services from them.

52.    Medicare and Medicaid do not provide payment for "monitoring" services for alleged homebound residents.

53.    Throughout Relator's tenure with FIRST STATE HHC, Kristin Hessling, Karissa Hollingsworth, Meredith Rosin and Anita Fournier, Office Manager openly discussed the number of patients receiving home health services who were not homebound.

54.    Relator estimates that approximately 50% of the patients receiving home health services from FIRST STATE HHC are not "homebound" under the applicable law and therefore not eligible for receipt of home health services under Medicare and Medicaid.

55.    From on or about June 15, 2013, and dates thereafter, Relator made multiple reports to the federal government regarding the allegations of false claims detailed above.

## COUNT I
## FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

56.    Relator incorporates by reference Paragraphs 1 through 55 of this Complaint.

57.    Defendants knowingly presented or caused to be presented to the United States and State of Michigan governments false or fraudulent claims for

payment or approval as detailed in paragraphs 43 through 55 inclusive above which claims were false or fraudulent by virtue of Defendants' certification, or implied certification, to the United States and State of Michigan governments that Defendants were in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

58.    The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II
## FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT

59.    Relator incorporates by reference Paragraphs 1 through 58 of this Complaint.

60.    Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments as detailed in paragraphs 43 through 55 inclusive above, which claims were false or fraudulent by virtue of Defendants' violation certification, or implied certification, to the United States and State of Michigan governments that Defendants were in compliance with the

Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

61.   The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT III
## FALSE CLAIMS ACT – CONSPIRACY

62.   Relator incorporates by reference Paragraphs 1 through 61 of this Complaint.

63.   Defendants, together with their employees and other persons or entities known or unknown, conspired to defraud the United States and the State of Michigan governments by agreeing to present false or fraudulent claims for payment or approval by the United States and the State of Michigan governments as detailed in paragraphs 43 through 55 inclusive above which claims were false or fraudulent by virtue of Defendants' certification, or implied certification, to the United States government and the State of Michigan that Defendants were in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

64.    The United States government and the State of Michigan were unaware of Defendants improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT IV
## VIOLATIONS OF THE CIVIL MONETARY PENALTIES LAW

65.    Relator incorporates by reference Paragraphs 1 through 64 of this Complaint.

66.    The provisions of 42 U.S.C. § 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL"), provide in relevant part as follows:

(a) Improperly filed claims

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that–

(1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines–

* * * * *

(B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,

* * * * *

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a-7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);

* * * * *

(7) commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this title;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; or in cases under paragraph (7), $50,000 for each such act). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid,

soliciteD, or receiveD for a lawful purpose). In addition the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(1) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program.

67.    In short, an individual or entity, excluding a federal health care program beneficiary, is subject to the penalties and assessments of the CMPL and to exclusion from participation in any federal health care program when that individual or entity (1) knowingly presents or causes to be presented to the United States government a claim for an item or service and the person knows or should know the claim is false or fraudulent; (2) offers to or transfers remuneration to a federal health care program beneficiary that the offer or/transferor knows or should know is likely to influence the beneficiary to order or receive "from a ***particular*** provider, practitioner or supplier" [emphasis added] any item or service for which payment is made in whole or part under a federal or state health care program; or (3) commits a violation of the Anti-kickback Statute.  *See* 42 U.S.C. §§ 1320a-7a(a)(1)(B), (a)(5), (a)(7), and 1320a-7(b)(7).

68.    Defendants are also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment.  *See* 42 U.S.C. § 1320a-7a(l).

69.    As required by law, Defendants expressly certified to the government that they were in compliance with all federal health care law, which includes the CMPL, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

70.    Defendants also implicitly certified to the government that they were in compliance with all federal health care law, which includes the CMPL, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

71.    Defendants performed the above illegal and improper acts and also directed its agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

72.    If the United States government had been aware of Defendants' improper and illegal conduct, including the false certifications, the government would not have made payment on or approved Defendants' claims for

reimbursement under Medicare, Medicaid, and other federal or state health care programs.

73.     By agreement and by law, Defendants were to comply with all Federal health care law, which includes the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services.  Defendants acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government and in providing remuneration to influence federal or state health care beneficiaries to order or receive goods from a particular supplier.

74.     As a result of Defendants' false and fraudulent certifications and claims for reimbursement, Defendants have violated the False Claims Act, the Michigan Medicaid False Claims Act and caused the United States government to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of herself and of the United States and the State of Michigan, requests judgment as follows:

A.     The United States and the State of Michigan are entitled to reimbursement of the funds obtained by Defendants as a result of fraudulent claims submitted to the United States and the State of Michigan.

B.     The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

C.     The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL, plus an assessment of not more than 3 times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States.  *See* 42 U.S.C. § 1320a-7a(a).

D.     The United States is entitled to exclude Defendants from participation in any federal health care program.  *See* 42 U.S.C. § 1320a-7(b)(7).

E.     Relator, Susan Vick is entitled to an amount for reasonable expenses necessarily incurred, plus reasonable attorneys' fees and costs.  *See* 31 U.S.C. § 3730(d).

F.     Relator, Susan Vick is entitled to an order of partial distribution of the damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S.C. § 3730(d); such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

Respectfully submitted,

HERTZ SCHRAM PC

By:    /s/ Patricia A. Stamler
       Patricia A. Stamler (P35905)
       Attorney for Plaintiff-Relator
       1760 S. Telegraph Road, Suite 300
       Bloomfield Hills, MI 48302-0183
       (248) 335-5000
       pstamler@hertzschram.com

Dated: June 2, 2014

## DEMAND FOR TRIAL BY JURY

NOW COMES Relator, Susan Vick, on behalf of herself and the United States of America and the State of Michigan, by and through her attorneys, HERTZ SCHRAM PC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

HERTZ SCHRAM PC

By:    /s/ Patricia A. Stamler
       Patricia A. Stamler (P35905)
       Attorney for Plaintiff-Relator
       1760 S. Telegraph Road, Suite 300
       Bloomfield Hills, MI 48302-0183
       (248) 335-5000
       pstamler@hertzschram.com

Dated: June 2, 2014

{H0129127.1}                    30